Emmanuel versus Roggio. Counsel's going to correct me if I've butchered the name. It's Emmanuel. Just Emmanuel. Just like the. All right. Yes, like the Greek that he is. I see a co-counselor's here. I can begin. May it please the court. I am John Markham for the appellant Roggio, and I've asked the crier for three minutes for rebuttal if I could confirm that. Very well, that'll be granted. Go ahead, sir. Thank you, your honor. Your honor, I do not have to say long and hard that the attorney-client privilege is vital to our system of justice and communication to lawyers and clients. And I respectfully submit, your honor, that the record as we have presented it in these briefs shows that it just evanesced out of the case. All right, so help me now. So on Westbelt and the mortgage, right, what's the, is there evidence in the record of a retainer agreement of any kind of letter agreement between Mr. Zachary Emanuel and Mr. Roggio? Yes, your honor. Three different judges below found that Zachary had been Mr. Roggio's lawyer. On those two matters, because obviously he was his lawyer on the Hout matter and their- And other matters. You know, the Gibraltar thing. Mr. Roggio believed that because Mr. Zachary had acted as his lawyer before, in this deal he was acting for Mr. Roggio as he had before. In fact, his ultimate malpractice claim against Zachary and was not that there was some sort of screw up, but that Zachary failed to tell Roggio, hey, now I'm representing my father too, so you have to do a waiver with me. There's a duty of loyalty warning he has to give. And also, Zachary took part in the deal. So for the purposes of the deal itself, one could debate whether there was a clear cut agreement between Roggio and Zachary. We contend we win that debate, but we also contend that we don't have to. Because the breaches of the privilege that were the most egregious in this case were not when Zachary was on the stand during a trial talking about what happened in the Westbelt deal, but when he was talking about his very first meeting with Roggio before Westbelt was a gleam in anybody's eye. Where they were going to go down to a Florida court, and they were going to try to wrest back money that had been stolen away from Roggio. He was trying to get it back civilly. Zachary was his lawyer. The very opening of trial, after I had reserved a standing objection to the privilege being breached, Zachary started talking about how Roggio walked into his office, no Westbelt in sight, no conflict in sight. And he told me how rich he was. He told me how many banks he had. But that's not a breach of attorney-client privilege, is it? That's not asking for advice. It's giving, Your Honor, I believe it is in that context, because it's giving background to your lawyer so your lawyer can figure out how to handle you. If you go to a lawyer and say, here's my background, here's where I come from, here are my experiences. Those should be treated as privilege. That information also came out otherwise, through other testimony, right? No, Your Honor, it came out through- About the background, and about how rich he was, and stuff like that? Well, there were some later references to the richness, but we contend that those came from Zachary. Because Zachary was the one who heard all of that stuff. But if you're a lawyer involved in a case like this, aren't you going to do a background study on the opponent? Aren't you going to look into what his resources are, who he is, where his money is, do we need to chase after him to make sure he doesn't send his money elsewhere? I mean, aren't those factual matters ones that very clearly are going to be looked into, whether Zachary has anything to do with the case or not? Yes, they are. And just like most facts that a client gives you, other than that moment where the client, when you're sitting in your office, I do some criminal work, and they say, yeah, I didn't file my taxes. Other than that type of thing, most of what a client tells the lawyer could be found another way. But in this case, it was undisputed that it came from communications from Roggio. And obviously, whether you could argue that some of that background came from somewhere else or not, it did come from him, and he said it came from him. But when we're talking about this area, right? It's not just, if Judge Tashima was my client, and we sat and talked for a half an hour about our families and about our backgrounds, and he has a house here, I have a house there, whatever, right? I mean, none of that falls within the ambit of an attorney-client privileged communication. It does, Your Honor, if the client comes to your office to give you the background that he thinks you need in order to be able to represent him. And admittedly, there is a fine line. If I come into your office, Your Honor, and you're the lawyer, and I say, I just came from my son's soccer game, he scored two goals, that has no bearing. But the details that Mr. Roggio gave Zachary over the course of those first meetings and after that. And certainly, what happened in the Hout Courtroom was privileged. That was not- How do you pronounce that case? How? Hout. Oh, Hout, yeah. The Hout case. That's the one where after Mr. Roggio had given all of the details of his background, details, by the way, you don't give out, like the fact that his mother had a super trust fund that was being administered in Philadelphia, like the fact that he had been in all these different businesses, all of his background. But to judge, to Seema's point, whatever material or critical information that you're alluding to that occurred in this opening part of the relationship, if you will, came out in Mr. Roggio's testimony, came out in documents. I'm having a difficult time understanding what exactly the nature of the violation is, and that's even before we get to Westbelt and the mortgage issue. All right, then let me just pass by saying that the first person who spoke the words were the first witness at the trial who gave all that background. That was Zachary, and he said it was because he'd come into his office. Now, that aside, Roggio and Zachary went to a hearing, and Roggio said something, and Zachary later told his second set of lawyers in this case what Roggio had said. A hearing was held below, and Judge Wilson- When you say he said something, you're talking about the testimony in chambers? Yes, Your Honor. All right. And that testimony in chambers was not, it was specifically held by the judge presiding below at the time, Judge Wilson. That not only had Zachary violated the attorney-client prisms before, the courts below looked at this carefully and found that this wasn't just chit-chat about soccer games, that he had violated the privilege twice before, resulting in the need to seal pleadings below, and in fact, strike pleadings below. But when it came to a hearing at which the McElroy firm, the second firm in for the Emanuels, because their first firm had been disqualified for this reason as well, it's clear on the record, Mr. McElroy firm gets up and says, didn't you say this and do this at the House hearing? But hadn't those facts then become known to all the world? I mean, should they ignore them? They were sealed. In fact, Judge Wilson found that if this was such an egregious decision, such an egregious breach of the privilege, that she herself sealed the transcript of the proceeding and ordered nobody to mention it. Well, now, let me go into that a little more. Now, both sides seem to assume that this matter is privileged, but this is testimony, right, before a judge. Opposing counsel was there, a reporter was there. How is that privilege? How does that come with an attorney kind of privilege when opposing counsel is present? I don't understand that. I believe the analysis is this, Your Honor. It is not one of those, it is not necessarily a confession you make to your lawyer. But if your lawyer learned something through representation, and as Judge Wilson pointed out and cited authority for it, if your lawyer learned something through the representational process, while somebody else may be able to say, hey, guess what I saw? Or guess what I heard? Your lawyer can't. It's a confidence that your lawyer learns. But the lawyer client privilege requires that the communication be made in confidence. Your Honor. How can it be in confidence if the judge is there and opposing counsel is there? Because it's not a communication confidence. It is a confidential piece of information that Judge Wilson found after a painstaking opinion was learned by the lawyer through his representation. So your point is, if you represent me and I go on television tomorrow and say, whatever, I'm one of the 10 richest people in the world, whatever, I told you that in confidence. Now I go on television and say that. You can never disclose that I said that to you, despite the fact that I've made this public admission. That's your point? My point is, yes, in the abstract. No, in the context of it, the whole world knows that it's not unknown. This was unknown. This was something that happened not in a public courtroom, in chambers, seven years before the cross-examination. And for that reason, the sitting judge who heard all the evidence below, Your Honor, said that the McElroy firm, quote, would have had no way to ask that question but for the intimate knowledge and unlawful disclosure of Zachary to the lawyer. Does the attorney-client privilege cover fraudulent statements by the client? It does not cover statements issued in order to further a fraud, like, hey, John, will you help me prepare fake tax returns? That's not a communication that is protected, because he's seeking my help in a crime. But if I see him committing a crime, if I see him, the allegation here that the judge credited was that the lawyer, Zachary, said, look, somebody's not here. Why don't you just say that you're that somebody? And then later, they clobbered him with that in court, and then they clobbered him with it in trial. And at the time they clobbered him in trial, Judge Wilson had sealed it and said that despite everybody's need and wish to have the most open of records and were reluctant to seal, she felt that it was so damaging, that it was something that was so intimate, so off the mark. And after she sealed it, thereafter, Judge Brown himself, when the law firm. That's not my question. My question was, does the attorney-client privilege relate to a statement, a fraudulent statement, by a client that a lawyer knows about? Yes, with one exception, that exception being if the statement is made to the lawyer in order to further a crime or a fraud, then no. But what the lawyer learns, representing the client about the client's misbehavior, is privileged. Even in circumstances if the lawyer knows where the horrible situations you see, the ethics first year law school where the kids are dying in the cave and the criminal won't tell everybody where it is and the lawyer knows. What the lawyer learns in the context of representation is privileged. And it was privileged. Every judge treated it until privileged, until exactly the opening bell of the trial. So on going back to Westbelt and the mortgage, so your position is Mr. Roggio believed that Mr. Emanuel, in the mortgage matter for instance, was representing Mr. Roggio in a transaction involving Mr. Emanuel's parents. Yes, because Zachary had been Roggio's lawyer by that time for about a year and a half. So lawyer once, lawyer forever, that's what was true. That's the problem and that's why he sued. Because yes, a lawyer once, a lawyer forever. If I've represented somebody, Your Honor, and then somebody else comes to me and I'm supposed to go back and negotiate for that person I represented, that's  saying I'm no longer your lawyer. That never happened here. Roggio was believed throughout that Zachary was his lawyer. Zachary sent him things for approval. Is there anything in the record with regard to Westbelt and the mortgage matter, anything tangible that represents evidence that Mr. Zachary Emanuel was representing Mr. Roggio on either of these two matters? Or is it merely him saying, you'd been my attorney in the past and I believed you to continue to be my attorney? Well, as Judge Brown pointed out in ruling that Concepcion, the law firm, could not use the privileged material, which Judge Brown thought was privileged to help matter, he pointed out that Roggio had paid Zachary six different attorney bills during the time period of 2001 and 2003. And that is exactly the time period that the Westbelt matter was going on. So he was paying him to do it. And do any of those bills reflect that they are payment for Westbelt or the mortgage matter? Your Honor, I believe that they were just generally stated bills. And I will scour to see if I can find them. But the fact is he was paying him as a lawyer. He was talking to him as a lawyer. As everybody noted in connection with the jurisdictional point that we discussed, Roggio was communicating to Zachary through the law firm, through the facts. He was getting drafts of agreements done by Zachary. Zachary was acting for a lawyer for every single purpose. And so seriously, the tie would definitely go to the runner here if it were a tie. But Zachary was acting like a lawyer. He was charging him like a lawyer. He had been his lawyer in the past. And he never said, I'm not your lawyer anymore. That's not the way a lawyer should behave. And as a consequence, what somebody says to a lawyer misbehaving that way, pretending to be a lawyer, he's not. Not saying, hey, this is my father, man. Get yourself another lawyer. He didn't say that. In those circumstances, everything that Mr. Roggio told him was confidential. And the facts below, found by Judge Wilson and found again by Judge Brown until the trial, when all of a sudden Judge Brown said, there's no license to lie anymore. And that's not the point. The privilege is not about lying. It's about protecting confidences. Thank you. OK. Thank you. Mr. Carey? It's actually Lewis Madunia, Your Honor. Since Mr. Markham didn't address any issues raised on his appeal in connection with Mr. Carey's client, Mr. Carey deferred to me, since most of your questions were directed at the Zachary Emanuel evidence in the record issues. Your Honor, my name again is Lewis Madunia with the law firm McElroy Deutsch Mulvaney Carpenter. We represent the Emanuels as well as Westbelt Auto Supply Inc. And if I can start, Your Honors, with certain answers based on the record, the questions that Your Honors answered, or asked rather. As far as evidence, Judge Greenway, I believe you asked Mr. Markham whether there was any evidence at all of a retainer agreement, any indicia of an attorney-client relationship written hard copy. Well, there is none. You can scour the record all you want. Mr. Markham can spend the next four hours or 40 days doing it. There is no evidence in the record suggesting that there was an attorney-client relationship. To the contrary, however, in regard to the mortgage note, there is evidence in the record, testimony at trial, testimony during depositions of Mr. Roggio where he had his own lawyer, a Ms. Giannarone. That name is reflected in the record. There's a letter that was submitted and offered as evidence without objection from Mr. Roggio. So you're talking about no evidence. You're talking about in the Westbelt litigation? In the underlying litigation, this litigation, Your Honor. But I mean, there had been past representation. In the HOUT matter, I don't even know Gibraltar, I think, was another one Judge Greenaway mentioned. Was there any withdrawal or notification by Zachary? To my knowledge, no, Your Honor. I don't know one way or another whether he did or did not. The other question, I think, Judge Roth, you asked Mr. Markham was, well, typical litigation. Don't you ask the defendant about his background? Yes, Judge, it's the first thing I do. I think first, it's a good thing anyone who deposes a party in the case does. Prior testimonies, prior cases, background, information, work experience, all offered up by Mr. Roggio. Not only during depositions, but at trial itself on direct examination by his own counsel. So. Including the HOUT? Well, the HOUT, Your Honor, I want to make something very clear, Mr. Markham did not in his papers and did not today. I, we, our firm, nor did our clients, did we raise the HOUT litigation at all in the underlying, in the trial. That was raised by Mr. Markham on direct examination of his own client. It was only after that direct examination where he spent countless time and energy on direct getting to the ultimate perjury down in the Florida case where the door was opened by him. I did not ask, nor did anyone ask on our behalf, that the HOUT matter be a subject of cross-examination. We only reserved the right to use it for impeachment purposes at trial. That was it. Judge Brown was not asked, in limine or otherwise, to allow us to direct Mr. Emanuel, Zachary Emanuel, on any issues regarding HOUT. We weren't going to do it. It was Mr. Markham that did it on direct examination. Well, I just meant to, who asked the question that required this answer, that yes, I said that at the Florida trial or whatever the answer was. Who asked it at trial, Your Honor? No, who asked that question of Zachary? I did not ask that question of Zachary. That was known. That issue of the HOUT trial. But that was in response to Judge Brown's ruling, right, well, I'm not going to permit this line to go on or something like that. So I'm going to rule that it's not privileged, right? Well, there are two issues, Your Honor. There's a slight distinction. The one issue is the HOUT matter issue, which is a sideshow, which is really the issue in the HOUT matter. They're trying to tie the HOUT matter to our firm's disqualification. How that argument is even raised on appeal after what Judge Bongiovanni ruled on and the lack of evidence and what Judge Brown ultimately decided. I'm talking about the testimony that he gave in the HOUT matter in chambers, right? Now, you say you didn't ask the question that disclosed that testimony. Is that right? I, just two different things. At trial itself, in front of a jury, I did not bring it up. That was Mr. Markham. I did bring it up at a preliminary injunction hearing. And the evidence, Your Honor- Mr. Markham brought it up in the trial, what, because Judge Brown ruled that I'm going to hold that the privilege doesn't apply or something like that. No, what he ruled was that if it comes up, I'm going to allow impeachment of it. If you so choose, counsel, to cross-examine Mr. Roggio on it for impeachment purposes, because I'm- So on his part, then, it was kind of, you know, like a defensive measure. Perhaps a defensive mechanism at all. I had other, believe me, we had other cross-examination fodder for Mr. Roggio. You didn't ask that question. I did not initially bring it up. It was his anticipation of a trial tactic that I may or may not have used. I wasn't going, he asked me to disclose it on the record, whether I was going to do it. I don't disclose trial tactics to my adversaries. It's not my style or my practice. But as far as, oh, Judge Roth, I believe you asked whether there was other information concerning Mr. Roggio's background and his wealth, well, there was a memo admitted into evidence, without objection, from the other side, from Central Bank. It was the Gurley Memo, and it's interesting. The evidence that they submit about the background was in response, it was, they cited my direct examination of Mr. Zachary Emanuel, and if you look at the questions, it relates precisely to line by line of a Gurley Memo, a memo produced by a third party in this case. Line by line, he was in Holland for a year. He reported no income this year. His family had a tremendous amount of wealth based on this Masco issue. If you look at that line of questioning, there's other evidence in the record about his background, not to mention the deposition testimony that he freely gave. As far as the issue, Your Honors, on attorney-client relationship, and Judge Greenwell, you focused on the retainer, whether he got out of the other case. He noted, I no longer represent you. Let's assume for the sake of argument that there was an attorney-client relationship. Let's talk about the waiver of it, whether he put it at issue in the litigation. He filed a verified complaint. He sued Mr. Zachary Emanuel's law firm. He's appealed that issue. He sued Zachary Emanuel. He took the guy's deposition four times, four times. Asked him detailed questions about the Westbelt matter and his dealings with his parents. I took Mr. Rocio's deposition for two painstaking days, where I asked tons of questions about his communications with Zachary. Not a once was the attorney-client privilege invoked. So all three elements, and they're all disjunctive tests, all three potential waivers occurred. He didn't waive it when I asked. He voluntarily disclosed it, and he put it at issue in the litigation. There's not even a close one on Judge Brown's ruling on this issue. Your Honor, the attorney fee issue that was not argued, but if Your Honors have any question, the only thing I would add to that is Judge Brown spent three years case managing this case. Judge Bongiovanni spent just as much time. Judge Wilson before Judge Brown spent time on this case. There are 350 plus docket entries. There is corresponding litigation. There are appeals to this court pre-trial. This is not a simple collection case. Mr. Rocio does and continues to do everything possible to avoid disjudgment. There's a current action pending. We cited it in our papers to enforce disjudgment. The man with all the wealth doesn't have any money. If you have any other questions, Your Honor, I'd be happy to answer them. No, thank you. I'd like to, if I could, clear up two points. We did everything but beg this and the lower court to prevent the privilege from coming up, specifically mentioning Houtt. After Judge Wilson sealed Houtt, we believed it was done, but they raised it again as part of what they wanted to do in their papers. We came to this, after Judge, we made a motion in Lemonade to prevent any communications from being testified to by Zachary, and it's different from getting information from bank document, and it's different from getting information from a deposition than getting it from a former lawyer. But, you know, before I was a judge, I used to take a lot of depositions, and like, excuse me, your opposing counsel, I would ask, have you been involved in other litigation? Have you given other depositions? Have you given other court testimony under oath? And you would go into all that, so that independently, wouldn't that have been discovered? Some of it may have been, and probably because you're a lawyer, a lot of it may have been, but your honor, that doesn't excuse the shortcut, and the reason why the first set of lawyers. Okay, it doesn't excuse the shortcut, it doesn't excuse Zachary Emanuel, but doesn't it excuse McElroy? Yes, it does, it does not excuse him, and I respectfully submit here's why. As Magistrate Bongiovanni said, when she excused the first law firm, the Scrincy firm, you don't have to show that they actually learned something, the fact that they might have, that they had access to information, is enough to disqualify them, because you gotta do it the old-fashioned way. You have to do it the way Judge Roth did when she was a practitioner. You gotta sit down with your pen and pencil. You can't call up the other lawyer, that disqualifies you. And that's what she ruled, and then Judge Wilson ruled that in fact, Mr. Madunio had gotten this information, he would never have known how to ask the question about how, without the intimate knowledge and the unlawful disclosure by Zachary to him. That's the only way he could have asked the question. He asked it. Now, after the motion in limine, right before trial was decided, and they could ask any question they wanted according to Judge Brown. Judge Brown, who previously said they couldn't. We not only asked Judge Brown not to allow that, we came to this court on a petition for writ of mandamus, which sat with this court for about five weeks, where this court didn't just deny it. The court said, you have a remedy after Judge Sotomayor's case, a recent case, to the effect that you can make your objection and then do it below. I did it below. I asked how it not be allowed to come into evidence. The judge said, I've ruled that it can. It's up to Mr. Madunio. Mr. Madunio, I asked him if he would, and fairly, he said he wouldn't. That is the only reason I asked the question because I knew it was coming in. We didn't come from Trenton over here to try to get that out. No, but you know, in a way, it's a kind of a ruling that you can't appeal because it's not adverse if you brought it in yourself. Your Honor, I believe that there's case law to the effect that if you bring up something because it's been ruled that it's admissible anyway, that doesn't affect the ruling. The only other case I'm aware of is, for instance, if the judge says a pretrial in limits, he says, well, yes, I'm gonna permit the opposing counsel to bring in your client's felony conviction if he testifies. For that reason, you decide, well, then I'm not gonna put him on the stand. Well, you can't complain about that ruling because you have to put him on the stand and you gotta invoke the ruling. Well, you're right, Your Honor. You have to invoke the ruling. You have to put him on the stand, and that's what I did. You didn't do that. Well, I put my client on the stand, and I asked him about help because I knew it was coming because the judge had refused to say it wasn't, and they had fought us all the way saying they should be allowed to do it. You say the cases support you on that? Yes, Your Honor, that if you are bringing something out to defang what you know a judge has ruled that your adversary's gonna put in, and what your adversary has spent the last three months fighting to get the permission to put in, and you do it as a defanging mechanism, Your Honor, you're allowed to do that. And just, if you could just... Well, the question isn't whether you're allowed to do it. The question is whether you're allowed to do it and then say I was forced to do it. Well, preserve your, you're quite right. I believe you preserve your objection if you do that. And here's how important that Hout thing was, that Hout reference was. It is the centerpiece of his closing argument. He told the jury, this guy lies. He lies to judges under oath. He's lied before. He lied in the Hout matter. A lawyer asked him a question, et cetera, et cetera. It's right in the middle. It should never have been disclosed. The sitting judge found as a fact it should never have been disclosed. The magistrate that came afterwards didn't disagree with that. She just said with respect to Madunio, there was no showing that Mr. Madunio's firm had actually induced the breach. That's not the test. The test is if they have access. They should do it the hard way, Your Honor. Like you did it. Like I do it. Like most honest lawyers do it. I'm not saying they're dishonest. Mr. Zachary was just telling everybody he could. The first complaint was stricken because it was laden with things that he'd put in the record that the judge first, Judge Hughes, sealed, and then Judge Wilson stricken. Then they put in a second one. Then they ambushed him with this Hout thing on the stand. Then the judge sealed it because it was so intrusive, she called it, and so harmful that she sealed it. And then we tried to fight to keep it out. Obviously, we didn't bring it in. Practically, we brought it in because we knew it was coming, Your Honor. And that's the only reason we brought it in, to try to at least have him have a chance to explain it. We wouldn't have gone within 50 feet of it had we not lost the ruling in this court and the ruling below. It was poison. Could I ask him a procedural question? Yes, Your Honor. Speaking of that, do you still have a motion to seal pending in this court? We do. All right. Any other motions still pending? I, all the motions to seal below, I believe, have been decided and matters have been ordered sealed to the full extent that we asked for. But the motion here is still pending, isn't it? Yes, Your Honor. That's right. All right, I just want to confirm that. Thank you. Okay, thank you. Thank you for your time, Your Honor. All right, thank you, counsel. We appreciate the fine arguments and well-written papers. We'll take the matter under advisement.